IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 18, 2021

## STATE OF TENNESSEE v. NICHOLAS GRASSIA

**Appeal from the Criminal Court for Knox County
Nos. 116237, 116265, 116278     Steve Sword, Judge**

_____

### No. E2020-00627-CCA-R3-CD

_____

The defendant, Nicholas Grassia, appeals the trial court's denial of his motion, filed pursuant to Tennessee Rule of Criminal Procedure 32, to withdraw his guilty pleas to charges of aggravated kidnapping and unlawful possession of a firearm by a convicted felon, arguing that the pleas were the product of the ineffective assistance of counsel. Because the defendant failed to establish manifest injustice requiring that he be allowed to withdraw his pleas, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Nicholas Grassia.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Knox County Grand Jury charged the defendant in case number 116237 with driving on a suspended license, evading arrest, and violating the financial responsibility law. The grand jury charged the defendant in case number 116265 with driving on a suspended license, unlawful possession of a firearm after having been convicted of a felony, possession of methamphetamine, and violating the vehicle light, registration, and financial responsibility laws. The grand jury also charged the defendant in case number 116265 with a criminal gang enhancement for the offense of unlawful weapon possession based upon his confirmed membership in the White Aryan Resistance.

The grand jury charged the defendant in case number 116278 with alternative counts of the aggravated kidnapping of Arrin Laitinen to facilitate the commission of a felony, alternative counts of the aggravated kidnapping of Ms. Laitinen where Ms. Laitinen suffered bodily injury, alternative counts of the aggravated assault of Ms. Laitinen by strangulation, and one count of witness intimidation in a criminal case involving domestic assault.

Pursuant to a plea agreement with the State, the defendant pleaded guilty on October 31, 2019, in case number 116265 to unlawful possession of a firearm and in case number 116278 to one count of aggravated kidnapping to facilitate the commission of a felony in exchange for a total effective sentence of 40 years and dismissal of all the remaining charges, including all of the offenses charged in case number 116237.

The stipulation of facts provided by the State at the plea submission hearing indicated that "[i]n Docket No. 116278, the proof would be that officers with the Knoxville Police Department responded to a domestic disturbance at 1313 Fourth Avenue" on July 15, 2019. When the officers arrived, Ms. Laitinen ran "out of that house and yelled at the officers that he's inside in the closet." Ms. Laitinen, who was "upset, crying and emotional," told the officers that "the defendant had beat her" and "showed . . . the officers that she had large bruises." Officers attempted to locate the defendant inside the residence, "however, they could not find him. There was an open window in the bedroom." Officers then interviewed the victim, who told them "that she and her friend had returned home from a friend's house and the victim and the defendant began to argue. The victim stated that the defendant became angry and became violent with her." Ms. Laitinen told the officers "that the defendant put his hands on her and forced her head into the side of the house wall, slamming it several times," that he "had pushed her down on the ground several times," and that he "punched the victim several times in the face and body." The defendant then "put his hands around the victim's neck and began to squeeze and strangle the victim" before putting "her in a rear neck and choke position and" attempting "to strangle her." The victim told the officers that "she had difficulty breathing during this time and that she was in fear of her life." "At some point in time, the defendant was able to get her from outside of the house to inside of the house and she did lose consciousness."

As to the charge of the defendant's being a felon in possession of a firearm in case number 116265, "[t]he proof would be that on August 7, 2019, officers were patrolling the Western Avenue and Virginia Avenue area and officers did observe a vehicle with an expired tag." The officers effectuated a traffic stop. The officers interviewed the defendant, who was driving, as well as his passenger, Melissa Davis. "Ms. Davis told the officers there was a gun in the car," and the officers ordered the defendant out of the car. Upon searching the vehicle, "they did recover a loaded handgun in the car." After being provided with *Miranda* warnings, the defendant "did acknowledge that that was his gun."

-2-

The defendant had prior convictions of aggravated burglary, aggravated kidnapping, and aggravated assault, each of which offenses involved the uses of violence and/or a deadly weapon. "Further proof would be that" the defendant made "numerous phone calls . . . concerning these incidents wherein he confessed to possessing the gun, and there w[ere] phone calls between h[im] and the victim."

On December 2, 2019, the defendant filed a pro se motion to withdraw his guilty pleas, asserting that his pleas were the product of the ineffective assistance of counsel. He argued that his trial counsel should have asked for a competency evaluation given the information contained in the defendant's "educational transcripts where education administration withdrew the defendant from special education classes due to disciplinary issues caused through frustration from the inability to comprehend schoolwork and normal socialization with peers." He also argued that his trial counsel failed to inform him that the charges of aggravated kidnapping and aggravated assault in case number 116278 violated double jeopardy principles and that this withholding influenced him to plead guilty. The defendant also claimed that the charging of so many alternative counts for each offense "only served as a means of intimidation" that coerced him into pleading guilty. The trial court appointed new counsel to represent the defendant and heard the defendant's motion on March 5, 2020.

At the hearing, the defendant testified that his trial counsel was appointed to represent him when his cases were still at the sessions court level and that counsel continued to represent him following his indictment. He agreed that he and trial counsel discussed trial strategy, "[w]itnesses coming and cross-examination, everything like that." The defendant said that counsel told him that he expected Ms. Laitinen, who was the mother of the defendant's child, to testify at trial and explained to him the elements of the offenses with which he had been charged and the evidence the State would likely use to support those offenses. The defendant recalled that counsel moved the trial court to reduce the defendant's bond and that, on the day that that motion was scheduled to be heard, he and counsel discussed the plea offer that he ultimately accepted in his case.

He said that he understood that the offer provided for a total effective sentence of 40 years. He further understood that the aggravated kidnapping charge "carried eight to 30" years at "a hundred percent" and that the plea offer included a sentence of 30 years at 100 percent for that charge. As to the firearms offense, the defendant said it "[c]arried eight to 30 . . . . I agreed to 10 at 45" percent service. The defendant insisted that the firearms offense "was being enhanced under a record that wasn't mine" and that he told counsel "that, and he said everything was legal on that . . . prospect of it." He claimed that the warrant charging that offense listed offenses that occurred in 1993 despite that the defendant was born in 1991. He explained that his father, whose name was also

Nicholas Grassia, had garnered those convictions. Nevertheless, the defendant agreed that he had prior convictions involving the use of force.

The defendant testified that before the hearing on his motion to reduce bond, he had discussed his mental health and substance abuse issues with trial counsel "[a] little bit." The defendant said that he was taking Lithium and Remeron at the time he pleaded guilty and that, in addition to any effects from that medication, there was a "[l]ot of stuff I don't understand, period, anyway. I can barely read or write." He said that counsel read and fully explained the conditions of the plea agreement and the contents of the rights waiver form that he signed before pleading guilty. The defendant insisted, however, that he was "irritated with" trial counsel at that point "because he was just not doing his full job." He elaborated, "He never went and got the background history of my kid's mama, never went [and] got the background history of her witness with her, and none of them was credible to go to trial, period." As to the firearms charge, the defendant agreed that the firearm was "in a vehicle I was driving" but said that "the vehicle was not mine; neither was the firearm." He maintained that both the vehicle and the firearm belonged to his stepfather and that he had only "confessed to it" because he had "been up for eight days" high on methamphetamine. He said that he told counsel that neither the vehicle nor the firearm belonged to him and that he did not know that the firearm was in the vehicle.

The defendant testified that he agreed to the plea offer because trial counsel told him that "the gang enhancement alone with the firearm carried no less than 40 years. And come to find out when I got the paperwork, it's no less than 15; no more than 60." He also explained that the sentence for the firearm conviction would be "a hundred percent day for day" and that he agreed to plead guilty because, if he accepted the State's offer, he could "at least get out in 29 years when I meet the parole board. Other way, I'd be doing 40 years and never see daylight again." He said that counsel told him that he was facing the gang enhancement "[b]ecause I was allegedly a member of the White Aryan Resistance" and because he "was ordered or . . . something like that by the gang to better the gang by carrying a firearm." The defendant insisted that he was "no longer an active member" of the White Aryan Resistance.

The defendant maintained that "there was play in between the kidnapping and felony evading, because there was no felony evading and there was no kidnapping charge." He said that the State had dismissed the kidnapping charge when the victim "didn't even show up for court." The defendant recalled that trial counsel told him that "it's always 50/50 whether" the victim would "show up or not. I know that." He testified that he did not think that a jury would believe Ms. Laitinen's testimony in any event because she had "already been charged with false reports against me once."

The defendant claimed that trial counsel did not give him any advice as to whether he should agree to the State's offer. He added, "It happened so quick. . . . I was on my medicine, and everything happened so quick. Before I even realized what happened, it was done. Too late." He said that the medication was given to him at the jail to treat his "bipolar and my mental problems." The defendant testified that he had been previously diagnosed with bipolar disorder and that he had dropped out of school in 12th grade due to his drug addiction. The defendant said that he did not tell counsel that he had taken any medication. He recalled, however, the trial court's asking during the plea colloquy whether he had taken "any drugs or alcohol in the last 24 or 48 hours, something like that" and that he told the trial court that he had not because "[m]edication, to me, is not drugs." He said that the medication made him drowsy and unable to think properly. The defendant also said that he was experiencing mood swings on the day of the plea colloquy and that he was "fighting mad" "[j]ust about this case, period." He added, "When a man's . . . mad like that, he don't think about nothing." He said that he was "agitated with the lawyer" for "[t]elling me it was legal for them with the affidavits and stuff." The defendant agreed that he "understood the plea deal" but insisted that he agreed to accept it "[j]ust to get away from all this" and "[t]o keep from spending the rest of my life in here."

The defendant said that, after pleading guilty, he had his cellmate "looking over my legal work, my motion to discovery and everything, about all of it. We got on the kiosk and started looking at West Law." The defendant then had another inmate draft the motion to withdraw his plea. He testified that he understood that, should the trial court grant his motion, the charges dismissed pursuant to the plea agreement would come back. He said that he also understood that the State was under no obligation to engage in any further plea negotiations.

During cross-examination, the defendant admitted that he had previous convictions of aggravated burglary and theft. He also had previous convictions for the kidnapping and aggravated assault of Ms. Laitinen in 2010 as well convictions for the kidnapping and aggravated assault of Ms. Laitinen in 2012. He agreed that, based upon these convictions, he was a Range III offender. He also agreed that the Range III sentencing range for a Class A felony was 40 to 60 years' incarceration.[1] The defendant said that he understood that he was not eligible for a sentence of less than 40 years as a Range III offender convicted of a Class A felony.

The defendant conceded that, while his charges were pending in sessions court, he contacted the Bureau of Alcohol, Tobacco, and Firearms ("ATF") in an attempt

---

[1] The gang enhancement would have elevated the defendant's conviction of being a felon in possession of a firearm from a Class B felony to a Class A felony. *See* T.C.A. § 40-35-121(b).

to have the firearm charge transferred to federal court. He believed that he would get less time in federal court than state court but said that "[w]ith my record, I'm getting big time no matter what." He acknowledged that he spoke to Ms. Laitinen on the telephone while the case was pending in the sessions court and that he specifically told her not to come to court again. The defendant acknowledged that that call formed the basis of the witness intimidation charge and conceded "that's me, you know what I mean. I'm not going to dispute that." He added, "I will admit to hitting that woman anytime. She stabbed me twice, and she told the police she stabbed me twice, and they let her go." The defendant admitted that he had listened to the recording of the 9-1-1 call placed by Ms. Laitinen's friend but insisted, "Thing about it is, you call her here today, she'll tell y'all that's a lie." He said that he was aware that Ms. Laitinen told the responding officers that the defendant had "[c]hoked her from the front; choked her from the back" and that she had almost lost consciousness. The defendant conceded that trial counsel had played for him other recordings of calls he had placed from the jail wherein he admitted to possessing a firearm and to possessing methamphetamine "in a burrito pack."

The defendant admitted that he told his mother in a recorded telephone conversation that the plea agreement "was the best thing I could take without getting 40 at a hundred." He acknowledged that trial counsel obtained a federal declination letter for him because he was concerned that if he pleaded guilty to the firearm charge in State court "then they pick me up when I got out." The defendant said that he was honest with the court during the plea colloquy when he said that he could read and write "enough" and when he said that he understood the charges, potential sentences, and the terms of the plea agreement. The defendant agreed that no one had coerced or forced him to plead guilty but said that "it ain't legal for y'all [to] charge me somebody else's charges on my affidavit gun warrant." The defendant conceded that he told the trial court that he was satisfied with trial counsel's representation and that that was true. He said that he accepted the plea offer because he wanted to do so.

The defendant testified that when he returned to the jail after pleading guilty, he telephoned his mother and told her what he had done. He admitted that his mother was not happy that he had pleaded guilty. The two discussed the fact that Ms. Laitinen had moved to Detroit and that, as a result, if they could get the plea set aside, Ms. Laitinen might not be available for any subsequent trial. He said that they also discussed the fact that Ms. Laitinen had "confess[ed] she caused this stuff on purpose, in a letter" to her husband and talked about getting Ms. Laitinen charged with a crime for assaulting the defendant with a knife.

During redirect examination, the defendant testified that he learned about the letter from Ms. Laitinen to her husband on the day that he entered his guilty pleas. He said that he was not surprised by the contents of the letter "'[c]ause this ain't the first time she's

repeated this. She's . . . done recanted once, because she lied. This is . . . a repeat ongoing thing." The defendant maintained that the contents of the letter would have impacted his decision to plead guilty. He said that at the time he accepted the plea offer, he thought the jury would believe "her friend, but come to find out her friend's credibility's no good either." He insisted that he had asked trial counsel "to do a background check and all that. He never done it."

During recross-examination, the defendant claimed that in the letter, Ms. Laitinen said that she "tried to kill her own self. That she tried to get--make me kill her." He said that the letter proved that Ms. Laitinen "stabbed me in the face" to get him to choke her and that "[t]his is not the first time this has happened." He admitted that he knew that Ms. Laitinen had been convicted of filing a false report before he pleaded guilty.

Trial counsel testified that he began representing the defendant while his case was at the sessions court level, that he met with the incarcerated defendant, and that he reviewed the discovery materials with the defendant. Counsel said that he and the defendant had discussed the issue of Ms. Laitinen's credibility. He explained, "I knew that she had been convicted of the false reports, a felony in Nashville, because I think in her cruiser tape she says they had like 11 domestics. On one of them, I think she then came to court and said it didn't happen . . . ." Trial counsel also obtained the rest of Ms. Laitinen's criminal history.

Trial counsel testified that he was also aware that, at some point, a warrant issued in the sessions court listed some of the defendant's father's convictions as belonging to the defendant. He added, "But I also knew they could amend that warrant with his actual violent record. . . . And when the indictment came out, it did have his record correctly." He said that the defendant had prior convictions for kidnapping, aggravated assault, and aggravated burglary, all of which were felonies involving the use of force or violence. Counsel explained that the State had filed a gang enhancement on the firearm charge that would have elevated it to a Class A felony, which, given the defendant's criminal record, would have carried a sentence of 40 to 60 years. Trial counsel said that, based on his experience, he believed that the State would be able to offer testimony through its gang expert "to get it to a jury" and that some of the defendant's recorded telephone calls seemed to confirm that the defendant was "a white supremacist." Counsel recalled that the defendant "had some tattoos that were relevant to the White Aryan Resistance" but that nothing indicated that the defendant was actively affiliated with the gang when he pleaded guilty.

Trial counsel said that, although the case was five months away from trial, he had already decided to challenge the aggravated kidnapping under *White*, making the argument that "even if the assault happened, it's not a separate kidnapping." Additionally,

with regard to trial strategy, counsel said that he had warned the defendant that, because he had warned Ms. Laitinen not to come to court in the recorded telephone calls from the jail, "if she didn't come to court, with the coercion charge, then they would be able to use her statement in the videotape."[2] Counsel recalled that the police cruiser video that included the victim's video recorded statement was very damaging to the defendant.

Counsel recalled the defendant's telling him that "he wasn't aware till right before they got pulled over" that there was a gun in the car he was driving. Based upon this information, trial counsel planned to argue that the defendant did not knowingly possess the gun. Trial counsel testified that he "probably did" know that the defendant had been diagnosed with bipolar disorder, recalling that someone with "social services in our office" had talked with the defendant. Counsel said that it was his recollection that the defendant "was on medication" and that he knew that the defendant had struggled with methamphetamine addiction.

Trial counsel testified that he and the defendant had discussed the defendant's taking a plea offer even before October 31, 2019, because the defendant "had very much wanted to not go to trial." He recalled that "we made an offer of 20 years. . . . and then 30 years, and neither one could we get the [S]tate to take. Then on that morning he asked me about 40 years at a hundred percent." He said that the defendant was particularly concerned about the firearm charge because he was worried that he might be charged with gun possession in federal court. Counsel said that he and the defendant discussed the possibility of a federal gun charge but, because counsel did not practice federal law, he could not advise the defendant about any sentence he might receive. At some point, the defendant met with an ATF agent without counsel's knowledge or approval. "He had just done it, and he thought they were going to give him 15 years in federal and not follow the [S]tate. So I think he knew something about federal, whether 15 years is accurate as to what he might have gotten."

Trial counsel said that, on October 31, 2019, he had planned to have a bond reduction hearing but that, at the defendant's request, trial counsel approached the State with the defendant's offer. He explained that the defendant

---

[2]     Given the evidence that the defendant had actively endeavored to coerce Ms. Laitinen into refusing to appear, counsel's statement is likely a reference to Tennessee Rule of Evidence 804(b)(6), which provides for the admissibility of the out-of-court statement of an unavailable declarant when the "statement [is] offered against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness." Tenn. R. Evid. 804(b)(6). "It seems only fair to let a party offer any extrajudicial statements of declarants whose unavailability was procured by the opponent." *Id.*, Advisory Comm'n Comments.

wanted . . . 40 years at a hundred percent--85 percent. The gun charge is not an 85 percent. So in making the 30-year offer on the agg[ravated] kidnapping, which I didn't think was the strongest case out there, that was, to me, what he was saying in terms of what we could offer the [S]tate. . . . I couldn't get to 40 years at 85 percent, but I could get to 30 years on the agg[ravated] kidnapping.

He said that the defendant agreed to offer to plead guilty in exchange for a Range III sentence of 30 years for the aggravated kidnapping and a Range I sentence length of 10 years combined with a Range II release eligibility percentage of 45 percent for the unlawful possession of a firearm. Trial counsel recalled that the defendant "asked me if it was a good idea" and that he replied "that it's not my practice to tell someone to take 40 years in prison." Nevertheless, trial counsel reiterated the potential sentence exposure should the defendant be convicted as charged, including the potential for a sentence of 40 to 60 years on the firearm charge alone. That same day, trial counsel obtained a "federal declination e-mail."

Trial counsel testified that the defendant did not appear to be under the influence of any medication and that, indeed, the defendant appeared as he had during the hearing on the motion to withdraw his pleas. He recalled that the defendant "was certainly agitated with his situation" but said that he did not "think he ever became agitated with me." Counsel said that, on that morning, he had explained to the defendant that the chances of the defendant's bond "being reduced were not high." He agreed that the defendant's learning that the court was unlikely to reduce his bond probably impacted the defendant's decision to make a plea offer because the defendant had previously expressed his frustration with the treatment he was receiving at the jail.

Trial counsel said that, shortly after pleading guilty, the defendant "left a voice mail about wanting to withdraw the plea." The defendant did not mention the letter purportedly written by Ms. Laitinen to her husband.

During cross-examination by the State, trial counsel agreed that, even if Ms. Laitinen had refused to testify against the defendant, the State had a video recording of her describing the offenses to the police and the recording of a conversation between the defendant and the victim while the defendant was incarcerated discussing the offenses in damning detail. Trial counsel also agreed that the defendant's criminal history clearly supported his being classified as a Range III offender and that the defendant was on bond for some of the offenses when he was charged with others, which meant that sentences for those offenses would be aligned consecutively to one another.

At the conclusion of the hearing, the trial court took the motion under advisement. In a written order denying relief, the trial court did "not find the defendant credible in any of his testimony," noting that, "[b]ased upon jail calls discovered by the State and the defendant's own testimony, it is clear that the defendant schemed early-on to enter this plea agreement and then request that it be set aside all in an effort to get the case dismissed." The court found that trial counsel's and the defendant's "testimony make it clear that the defendant knew exactly what he was doing when he entered the guilty plea." The court determined that trial counsel had "diligently investigated and litigated the case" and had "worked on every issue raised by the defendant and the evidence in the case." The court concluded that "[t]he defendant made a rational decision to make a plea offer to the State to receive a significantly lower sentence than he was facing had he gone to trial. He got what he bargained for." The court found that the defendant "was attempting to [undo] an agreement that he devised in the hopes that he can obtain an even better result by coercing the victim not to appear in court" and that the defendant was "deceptive in the entirety of his testimony." The trial court concluded that the defendant's pleas were knowingly and voluntarily entered and not the product of ineffective assistance of counsel because counsel did not perform deficiently. Thus, the court concluded, "the defendant has failed to establish that his plea must be set aside to correct a manifest injustice. To the contrary, the court finds that allowing the defendant to withdraw his guilty plea would, in itself, be a manifest injustice."

The decision whether to permit a defendant to withdraw his plea "is a matter addressed to the sound discretion of the trial court, regardless of when the motion is filed." *State v. Crowe*, 168 S.W.3d 731, 740 (Tenn. 2005); *see also State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010); *State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003). Consequently, this court reviews "a trial court's disposition of a defendant's motion to withdraw his or her plea of guilty for an abuse of discretion." *Phelps*, 329 S.W.3d at 443 (citing *Crowe*, 168 S.W.3d at 740). A reviewing court will find an abuse of discretion when the trial court "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party," *Phelps*, 329 S.W.3d at 443 (citing *State v. Jordan*, 325 S.W.3d 1, 38-40 (Tenn. 2010), and "when the trial court has failed to consider the relevant factors provided by higher courts as guidance for determining an issue," *Phelps*, 329 S.W.3d at 443 (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A guilty-pleading defendant "does not have a unilateral right to later withdraw his plea either before or after sentencing," and, in consequence, "bears the burden of establishing sufficient grounds for withdrawing his plea." *Phelps*, 329 S.W.3d at 444. Rule 32(f) of the Tennessee Rules of Criminal Procedure provides that, "[a]fter sentence is imposed but before the judgment becomes final, the court may set aside the judgment of conviction and permit the defendant to withdraw the plea to correct manifest injustice."

Tenn. R. Crim. P. 32(f)(2). The term "manifest injustice" is not defined either in the rule or in those cases in which the rule has been applied; instead, trial courts and appellate courts must determine whether manifest injustice exists on a case by case basis. *See Crowe*, 168 S.W.3d at 741-42 (recognizing absence of definition for manifest injustice and citing examples of circumstances warranting withdrawal); *State v. Turner*, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995). When determining whether the defendant should be permitted to withdraw his guilty plea to correct a manifest injustice, a court must carefully scrutinize the circumstances under which the trial court accepted the plea. An analysis of the plea submission process under Tennessee Rule of Criminal Procedure 11(b) facilitates an inquiry into the existence of manifest injustice. *See generally State v. McClintock*, 732 S.W.2d 268 (Tenn. 1987) (for rules concerning acceptance of guilty pleas); *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977) (same). Tennessee courts have allowed the withdrawal of guilty pleas to prevent manifest injustice when

> (1) the plea "was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily"; (2) the prosecution failed to disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and this failure to disclose influenced the entry of the plea; (3) the plea was not knowingly, voluntarily, and understandingly entered; and (4) the defendant was denied the effective assistance of counsel in connection with the entry of the plea.

*Crowe*, 168 S.W.3d at 742 (citations omitted). Courts have also found that manifest injustice resulted from the trial court's failure to advise a defendant of the appropriate sentencing range, to apply the appropriate sentencing statute, or to inform a defendant of the consequences flowing from the guilty plea. *See generally State v. Nagele*, 353 S.W.3d 112 (Tenn. 2011). A guilty plea, however, should not be withdrawn merely because the defendant has had a change of heart, *Crowe*, 168 S.W.3d at 743; *see also Ray v. State*, 451 S.W.2d 854, 856 (Tenn. 1970), nor should a defendant's dissatisfaction with an unexpectedly harsh sentence be sufficient justification for a withdrawal, *Crowe*, 168 S.W.3d at 743; *see also Clenny v. State*, 576 S.W.2d 12, 15 (Tenn. Crim. App. 1978).

In our view, the trial court did not abuse its discretion by denying the defendant's motion. The defendant's testimony indicated that the defendant was familiar with the court system, that he was aware of his own criminal record, and that trial counsel informed him of the nature of the charges against him as well as the potential sentences that could be imposed upon conviction. We agree with the trial court that, indeed, the defendant knew exactly what he was doing when he pleaded guilty. Both the defendant and trial counsel indicated that the defendant's primary concern lay with the firearm

charge, which carried the lengthiest sentence potential as well as the potential for a dual federal prosecution. The plea offer crafted by trial counsel and extended to the State at the defendant's behest resolved the sentence length issue, and trial counsel obtained a promise from the federal prosecutor not to charge the defendant. As the trial court found, the evidence presented at the motion hearing, far from indicating that the defendant should be permitted to withdraw his pleas to prevent a manifest injustice, established that the defendant moved to withdraw his pleas as part of a scheme concocted by the defendant.

Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE